**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RANDY THOMAS**,<br><br>              Plaintiff,<br><br>      v.<br><br>**WASHINGTON METROPOLITAN**<br>**AREA TRANSIT AUTHORITY**,<br><br>              Defendant. | Case No. 22-cv-3097 (CRC) |

## MEMORANDUM OPINION

Washington Metropolitan Area Transit Authority ("WMATA") operates the Metrobus public transportation system in Washington, D.C., and its neighboring states. On a September morning in 2021, a Metrobus pulled up to the Dupont Circle bus stop in D.C., and Randy Thomas, who is disabled, began to disembark. Standing at the bus's front door, Thomas placed the legs of the walker he uses for support onto the curb in front of him and moved his foot over the precipice. Unfortunately, Thomas's leg did not reach the curb; instead, it landed between the bus and the sidewalk, and he lost his balance and fell onto the pavement. Thomas sued WMATA for his resulting injuries. He alleges that the Metrobus driver negligently failed to maneuver the vehicle close enough to the curb for him to disembark safely. WMATA now moves for summary judgment, asserting, inter alia, that sovereign immunity bars Thomas's suit and that Thomas has failed to make out a claim of negligence as a matter of law. Concurring with the second of these contentions, the Court will grant WMATA's summary judgment motion.

I.  **Background**

Randy Thomas, a D.C. resident and senior citizen whose physical disability requires the use of a rolling walker, has been a regular passenger on WMATA's buses for years. Opp'n at 3–4, ECF No. 14 at 3–4. On the morning of September 17, 2021, Thomas followed his routine of catching a Metrobus at a stop near his home in Northwest Washington. Opp'n at 3, ECF No. 14 at 3. When he entered the bus, he was greeted by the familiar face of Karenice Delbe, a Metrobus driver he had come to know and trust from dozens of previous trips they had taken together. See Opp'n at 3, ECF No. 14 at 3. After boarding without issue, Thomas rode the Metrobus to the Dupont Circle stop, where he planned to get off. Compl. ¶ 2, ECF No. 1 at 9.

The Dupont Circle stop is on a bridge, so a bus approaching and exiting the stop at a sharp angle must be careful to avoid being side swiped by cars trying to pass. See Opp'n, Ex. A ("Delbe Dep.") at 11, ECF No. 14 at 22. On the day in question, Delbe attempted to pull up between six to twelve inches from the curb per WMATA protocol. Delbe Dep. at 11, 42–43, ECF No. 14 at 22, 24. But Thomas contends that Delbe actually pulled up between two to two-and-a-half feet from the curb. Opp'n, Ex. B ("Thomas Aff.") at 1, ECF No. 14 at 29.

Once the bus had stopped and Thomas started to get up, Delbe asked whether he would like her to reposition the bus closer to the curb. Delbe Dep. at 11, ECF No. 14 at 22. Thomas, however, was listening to Gospel music on headphones and did not hear or respond to Delbe's question. Opp'n, Ex. E ("Thomas Dep.") at 25–27, ECF No. 14 at 54. Instead, he thanked her and moved toward the door. Thomas Dep. at 25, ECF No. 14 at 54. Delbe then began to "kneel" the bus to the curb. See Delbe Dep. at 10, 44, ECF No. 14 at 22, 24. When Thomas reached the door, he placed his walker on the curb in front of him but could not extend his foot across the space between the door and the sidewalk. Thomas Dep. at 21–24, ECF No. 14 at 53. As a result,

his foot fell short of the curb onto the street, and he lost his balance and hit the pavement. Thomas Dep. at 21–24, ECF No. 14 at 53.  Thomas admits he did not carefully observe the distance he needed to cross before stepping because his walker obstructed his view but says that he trusted Delbe to pull the bus all the way to the curb as she had done in the past.  Thoms Aff. at 1, ECF No. 14 at 29; Thomas Dep. at 21–22, ECF No. 14 at 53.

Thomas subsequently sued WMATA in the Superior Court of the District of Columbia, asserting that his fall and resulting injuries were caused by Delbe's negligence in failing to position the bus at a safe distance from the curb.  See Compl ¶¶ 1–8, ECF No. 1 at 8–10. WMATA removed the case to this Court, which has original jurisdiction over suits against WMATA.  See Notice of Removal ¶¶ 4–5, ECF No. 1 at 1–2 (citing Pub. L. No. 89-774, 80 Stat. 1324, 1350 (1966); D.C. Code § 9-1107.10).

WMATA now moves for summary judgment, arguing:  First, Thomas's claim is barred by WMATA's sovereign immunity; second, WMATA had no duty to Thomas to stop its buses at a given distance from the curb; third, Thomas cannot establish the relevant standard of care without providing expert testimony; and fourth, Thomas was contributorily negligent.  Mot. Summ. J. Mem. at 1, 8, ECF No. 12 at 1, 8.  The Court disagrees with WMATA's threshold jurisdictional argument that WMATA is immune from answering Thomas's claim.  But it agrees on the merits of issue three; Thomas has not made out a prima facie case of negligence under D.C. law because he did not provide expert testimony on the requisite standard of care.  This omission is sufficient to warrant summary judgment in WMATA's favor, so the Court need not consider WMATA's alternative arguments.

3

## II. Legal Standards

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only when a reasonable factfinder could find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a fact is "material" only if it can affect the outcome of litigation. Id. In determining whether summary judgment is appropriate, the Court must "view the evidence in the light most favorable to the nonmoving party . . . , draw all reasonable inferences in [his] favor, and eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party may oppose summary judgment using "any of the kinds of evidentiary materials listed in Rule 56(c)." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). This evidence includes materials found in the record, such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

"[S]overeign immunity is an 'affirmative defense,'" so the party claiming immunity bears the burden of proof. Simon v. Republic of Hungary, 77 F.4th 1077, 1117 (D.C. Cir. 2023) (quoting EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A., 894 F.3d 339, 345 (D.C. Cir. 2018)).

## III. Analysis

Because "sovereign immunity claims are jurisdictional," the Court must first address WMATA's contention that it is immune from this litigation. Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (citing Edelman v. Jordan, 415 U.S. 651, 678 (1974)).

A. <u>Sovereign Immunity</u>

WMATA argues that it is immune from suits implicating its decisions about where to curb its Metrobuses. Mot. Summ. J. Mem. at 4, ECF No. 12 at 4. But WMATA is not immune from suit in this case because Thomas alleges that his claim arises from Delbe's failure to abide by WMATA's curbing policy, and sovereign immunity does not bar suits based on an employee's failure to follow such a prescribed course of conduct.

WMATA was created by an interstate compact between Maryland, Virginia, and the District of Columbia ("the WMATA Compact"). <u>See</u> D.C. Code Ann. § 9–1107.01. Federal law applies to the interpretation of the WMATA Compact's terms. <u>Beebe v. WMATA</u>, 129 F.3d 1283, 1288–89 (D.C. Cir. 1997). As a "a quasi-governmental entity," WMATA is sometimes entitled to share in the sovereign immunity of its signatories. <u>See</u> <u>KiSKA Constr. Corp. v. WMATA</u>, 321 F.3d 1151, 1158 (D.C. Cir. 2003) (quoting <u>Beatty v. WMATA</u>, 860 F.2d 1117, 1126 (D.C. Cir. 1988)). More specifically, the WMATA Compact provides that WMATA "shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent committed in the conduct of any proprietary function . . . but shall not be liable for any torts occurring in the performance of a governmental function." D.C. Code Ann. § 9–1107.01(80).

The D.C. Circuit has interpreted the WMATA Compact's distinction between proprietary and governmental functions to incorporate the distinction between ministerial and discretionary functions from the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671–2680. <u>KiSKA</u>, 321 F.3d at 1158. "Under this framework, when the agency commits a ministerial act, it is engaging in a proprietary function," and therefore its acts are not shielded from suit. <u>Tapp v. WMATA</u>, 306 F. Supp. 3d 383, 396 (D.D.C. 2016). And vice versa: When an agency acts in a

discretionary capacity, it is exercising its governmental function and thereby protected from suit. See KiSKa, 321 F.3d at 1158.

Before attempting to parse whether the challenged conduct is ministerial or discretionary, however, "courts [generally] first ask whether . . . [it] 'amounts to a "quintessential" governmental function, like law enforcement.'" Tapp, 306 F. Supp. 3d at 396 (quoting Beebe, 129 F.3d at 1287). But, here, WMATA has not asserted that its curbing decisions are "'quintessential' governmental function[s]." As a result, the Court proceeds to the D.C. Circuit's "two-part test for determining whether the act was committed pursuant to a [ministerial or] discretionary function." Id.

Under this test, courts first consider "whether any statute, regulation, or policy specifically prescribes a course of action for [the] employee to follow." KiSKA, 321 F.3d at 1159 (quotation marks omitted) (quoting Beebe, 129 F.3d at 1287). If it does, and "the tort claim arises from a WMATA employee's failure to act as the law specifically prescribes, the conduct is not shielded by immunity." Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1138 (D.C. Cir. 2015). "If the law leaves the conduct in question to the official's discretion, [the court] then ask[s] 'whether the exercise of discretion is grounded in social, economic, or political goals.'" Id. (quoting KiSKA, 321 F.3d at 1159). "Only actions grounded in such discretion retain 'governmental function' immunity." Id.

Applied here, first, there is a "statute, regulation, or policy" that "specifically prescribes [the] course of action" a WMATA employee must follow when making curbing decisions. KiSKA, 321 F.3d at 1159 (quoting Beebe, 129 F.3d at 1287). WMATA's Standard Operating Procedures instruct drivers on how to curb buses at different types of Metrobus service stops. There are three types of stops—curb-lane service stops, restricted service stops, and obstructed

service stops—determined by how difficult it is for the driver to access the curb based on "location," "available space," and potential "obstructions." Opp'n at 9, ECF No. 14 at 9; Opp'n, Ex. D ("WMATA Standard Operating Procedures") at 16–17, ECF No. 14 at 42–43.

At her deposition, Delbe identified the Dupont Circle stop as a curb-lane service stop. Delbe Dep. at 41, ECF No. 14 at 24. Accordingly, per WMATA's Standard Operating Procedures, Delbe had to maneuver the bus to "be at an angle to protect the left outside mirror" and to ensure that the front door was "within 6 inches of the curb, the left rear of the bus . . . [was] within its own lane[,] and the rear doors . . . [were] between 12–18 inches of the curb." WMATA Standard Operating Procedures at 16, ECF No. 14 at 42. Delbe wavered in her deposition as to exactly how far from the curb she stopped the bus. Compare Delbe Dep. at 11, ECF No. 14 at 22 ("[S]o when I pulled into the stop, it's six to [twelve] inches."), with Delbe Dep. at 42–43, ECF No. 14 at 24 (when asked whether she was "within six inches of the curb that day," responding "I can't recall, but far as opening up the door and looking at the sidewalk . . . I can't recall"). Thomas insists Delbe was further than six to twelve inches from the curb. Thomas Aff. at 1, ECF No. 14 at 29 ("I then noticed the large gap, 2–2½ feet from the bus step."). If, as Thomas claims, Delbe did not position the bus so that the front door was within six inches of the curb, then she did not follow WMATA procedure, and "WMATA cannot claim that [her] decision to violate its policy is entitled to immunity." Robinson v. WMATA, 858 F. Supp. 2d 33, 39 (D.D.C. 2012).

Because the Court must "view the evidence in the light most favorable to" Thomas and "draw all reasonable inferences in [his] favor," Czekalski, 475 F.3d at 363, it will assume that Delbe failed to comply with WMATA's protocol to maneuver the Metrobus so that the front door was within six inches of the curb. Accordingly, WMATA is not immune from the present

7

litigation because "immunity does not bar suits based on an employee's failure to follow [a] prescribed course of conduct." KiSKA, 321 F.3d at 1159 (quoting Burkhart, 112 F.3d at 1217).

  B. Expert-Testimony Requirement

On the merits, WMATA contends that Thomas did not make out a prima facie case of negligence because he did not offer expert testimony to establish the standard of care. Mot. Summ. J. Mem. at 8–9, ECF No. 12 at 8–9. The Court agrees; Thomas's failure to provide expert testimony entitles WMATA to judgment as a matter of law.

D.C. law applies. See Briggs v. WMATA, 481 F.3d 839, 843 (D.C. Cir. 2007). Under D.C. law, "the plaintiff in a negligence action bears the burden of establishing three elements: 'an applicable standard of care, a deviation from that standard by the defendant, and injury resulting from that deviation.'" Robinson v. WMATA ("Robinson II"), 941 F. Supp. 2d 61, 67 (D.D.C. 2013) (quoting Scott v. District of Columbia, 101 F.3d 748, 757 (D.C. Cir. 1996)), aff'd, 774 F.3d 33 (D.C. Cir. 2014). D.C. imposes an additional requirement on the first element: "A plaintiff must introduce expert testimony to establish the applicable standard of care that is alleged to have been violated, unless the applicable standard is 'within the realm of common knowledge and everyday experience,' or within 'the ken of the average layperson.'" Id. (first quoting Hill v. Metro. Afr. Methodist Episcopal Church, 779 A.2d 906, 908 (D.C. 2001); and then quoting Briggs, 481 F.3d at 845). "Furthermore, the applicable standard of care in this sort of case is a national standard of care." Id. (applying national standard of care in negligence suit against WMATA) (citing Briggs, 481 F.3d at 846–47 (same)).

In applying its expert-testimony requirement, "[t]he D.C. Court of Appeals has required expert testimony in a number of cases that, on first blush, appear to be within the realm of

common knowledge." Briggs, 481 F.3d at 845 (citations omitted).  For example, it has determined that the following subjects required expert guidance:

> maintenance of leaning trees; application of hair relaxer; tightness of handcuffs; cushioning for the ground underneath playground monkey bars; maintenance of street lights to prevent falling light globes; time frame for ordering building materials on a construction project; response when an arrestee is found hanging in his cell; and installation of "a crosswalk, instead of a stop sign, light, or crossing guard."

Id. (citations omitted).  Thus, "[t]he case law indicates that the 'common knowledge' exception to the expert testimony requirement is recognized only in cases in which everyday experience makes it clear that jurors could not reasonably disagree over the care required." Id.

Thomas concedes that he has not offered expert testimony on the relevant standard of care but contends it was not necessary, as the question of how close a Metrobus driver must get to the curb for a disabled passenger to safely disembark falls within the common-knowledge exception.  Opp'n at 7–8, ECF No. 14 at 7–8.  But, as another court within the Circuit has concluded, "where a plaintiff seeks to establish standards regarding the specific procedures that public transit bus operators should follow . . . a plaintiff must present expert testimony, as the standards governing the operation of city buses are distinctly related to an occupation that is 'beyond the ken of the average layperson.'" Robinson II, 941 F. Supp. at 67 (quoting Briggs, 481 F.3d at 845).

Thomas attempts to circumvent this requirement by arguing that, when Delbe asked him whether he would like her to move the bus closer to the curb, she made an "admission against interest" that "would be clear to the jury, so that an expert would not be required to explain . . . this case."  Opp'n at 7, ECF No. 14 at 7.  But this argument actually goes to negligence's second prong: "a deviation from [the] standard by the defendant." Robinson II, 941 F. Supp. 2d at 67.  Delbe asking Thomas whether he would like her to move closer to the curb would be probative

9

of her negligence only if the standard of care required her to be closer to the curb. But Thomas has not introduced expert testimony to establish this standard of care.

Thomas also asserts that WMATA's standard operating procedures established Delbe's duty to position the front door of the bus within six inches of the curb. Opp'n at 8–11, ECF No. 14 at 8–11. But, again, evidence of these procedures cannot cure the lack of expert testimony. Robinson II, 941 F. Supp. 2d at 68 ("Violations of procedures prescribed by an agency's internal manual also are insufficient in themselves to establish the standard of care, as 'a defendant cannot be held liable for aspiring to efforts beyond an applicable national standard.'" (quoting Varner v. District of Columbia, 891 A.2d 260, 269–70 (D.C. 2006)); see also Clark v. District of Columbia, 708 A.2d 632, 636 (D.C. 1997) ("[E]xpert testimony [would still be] required to establish that the [procedure] . . . embodied the national standard of care and not a higher, more demanding one."); Briggs, 481 F.3d at 848 ("The D.C. Court of Appeals has held that such internal policies—standing alone—cannot demonstrate the applicable standard of care."). "To hold otherwise would create the perverse incentive for [WMATA] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions." District of Columbia v. Arnold & Porter, 756 A.2d 427, 435 (D.C. 2000) (quoting Clark, 708 A.2d at 636).

Because Thomas has not "adduce[d] expert testimony . . . to establish the applicable standard of care," he has failed, as a matter of law, to make out a claim of negligence against WMATA. See Varner, 891 A.2d at 265. The Court will therefore grant summary judgment in WMATA's favor.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate final, appealable order to that effect accompanies this Memorandum Disposition.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>September 6, 2024</u>